DuReee, Judge,
delivered the opinion of the court:
Plaintiffs were officers in a National Guard engineering unit called to extended active duty. Their unit was stationed at "Walters Air Force Base, Texas. On January 28, 1952, orders were issued directing their unit to report for temporary duty to Kelly Air Force Base, Texas, to accomplish a “construction training project” which was to be completed on or about June 1, 1952. In this action plaintiffs seek $5.00 per diem allowances for every day that each served at Kelly Air Force Base, allegedly pursuant to the governing Joint Travel Regulations. The General Accounting Office has ruled adversely to plaintiffs’ claims. The parties have entered a stipulation pursuant to Rule 38(c) under which only the issues of fact and law relating to the right of plaintiffs to recover generally were litigated below and are presently before us.
Pursuant to section 4205 of the applicable Joint Travel Regulations, per diem allowances were provided as follows:
(a) For temporary duty at an installation when government quarters were available-$5.00
(b) For temporary duty at an installation for courses of instruction:
(1) Government quarters available — government mess not available-$5. 00
(2) Government quarters and government mess available_$1. 00
Inasmuch as the Government does not contend that plaintiffs fell within one of the categories excepted from the substance of the regulation set out above, to establish entitlement to per diem allowances of $5.00 plaintiffs must prove that their temporary duty at Kelly Air Force Base was not in pursuit of courses of instruction, or alternatively, if that duty were in pursuit of courses of instruction, that no Government mess facility was available to them while on such temporary duty.
The “construction training project” undertaken by plaintiffs’ unit at Kelly Air Force Base consisted of construction and rehabilitation of roads, installation of railroad spurs, *703 construction of new buildings, extensive excavation for drainage ditches, installation of considerable lengths of concrete pipe, and placing concrete eighteen inches thick over an area of 55,200 square yards for a parking apron. This work resulted in permanent improvements to the military installation.
Plaintiffs’ orders mentioned nothing of “courses of instruction,” they attended no classes, and received no instruction. Nevertheless, defendant contends that this duty constituted a course of instruction within the meaning of section 4205, presumably in the sense that it was “on the job training” whereby plaintiffs would learn from experience.
However much additional erudition plaintiffs might have acquired from the projects prescribed, such as digging drainage ditches, laying pipe, building roads and concrete parking aprons and other similar activities for the Air Force Base, we believe something more to be required to constitute the exercise a “course of instruction.” For the purposes of this proceeding we need not specifically define “course of instruction.” It is sufficient that we conclude that the facts of this case present no indication whatever of anything resembling either a course or instruction, let alone a course of instruction.
Individuals performing such duty were thus entitled to receive $5.00 per diem allowances pursuant to section 4025 of the Joint Travel Kegulations. Inasmuch as we have decided that this duty was not in pursuit of a course of instruction, we need not determine whether a Government mess facility was available during such temporary duty at Kelly Air Force Base.
This case will be remanded to the Commissioner for a determination of the right of each individual plaintiff to recover, and the amount of the Government’s liability to each plaintiff so entitled.
It is so ordered.
Darr, Senior District Judge, sitting by designation; Laramore, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
*704 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. On January 28, 1952, orders were issued by Headquarters, Aviation Engineer Force, Wolters Air Force Base, Texas, directing the 950th Engineer Aviation Group to “accomplish a construction training project” at Kelly Air Force Base, Texas, to be completed by approximately June 1,1952. The construction to be accomplished was described as follows:
(1) Clearing of open trapezoidal drainage ditch (approximately 30' wide x 15' deep, 7.3 miles long) of all trees and vegetation and repairing concrete dams and ditch checks.
(2) Construction of approximately % mile of roadway with concrete surface.
(3) Placing two 42" concrete pipes side by side in open drainage ditch and cover with earth (approximately 3,000 feet long).
(4) Erection of three Butler Hangars, 40 x 100,40 x 80, and 80 x 80.
(5) Placing concrete for parking apron, approximately 18" thickness (estimated 55,200 sq yds).
(6). Construction of railroad spurs a total of 3y2 miles.
(7) Rehabilitation of roads 2y2 miles in length with macadam surface.
2. Pursuant to the mission outlined in the order of January 28, 1952, Headquarters, 950th Engineer Aviation Group, issued letter orders, on February 1, 1952, to 17 officers and 228 enlisted men of the 1901st Engineer Aviation Battalion to proceed to Kelly Air Force Base, Texas, for temporary duty for approximately 120 days in connection with the project mission, and to return upon completion of the temporary duty to Wolters Air Force Base. Similar orders were issued both before and after February 1,1952, to other officers and enlisted men of the battalion, the plaintiffs in this suit being included in the series of orders. The orders provided that officers would be responsible for the completion of certificates of the availability of quarters as prescribed by chapter 4, paragraph 205, subparagraph 7, Joint *705 Travel Regulations, and enlisted men would utilize Government quarters and messing facilities when available.
3. Chapter 4, paragraph 205, subparagraph 7, of the Joint Travel Regulations deals with the payment of per diem under circumstances which vary on the basis of availability or unavailability of Government-furnished quarters and Government-furnished messing facilities.
4. Pursuant to special orders issued under the construction directive (finding 1), each of the plaintiffs in this action proceeded to Kelly Air Force Base and served on temporary duty at Kelly Air Force Base for varying periods of time between February 1, 1952, and June 30, 1952, carrying out the project mission outlined in the orders of January 28,1952.
5. Although the project mission was designated as a “construction training project,” no member of the battalion attended any school or instruction course within the usual meaning of those terms while on duty at Kelly Air Force Base.
6. The projects worked on by the battalion consisted of the renovation of a drainage canal that took storm drainage from Kelly Air Force Base and discharged it into a river, the paving of streets, the paving of parking aprons alongside the runways, which aprons were 36" in thickness, and other similar permanent improvements of the military installation.
7. Government quarters were available during the period of temporary duty, and the maximum claimed by each plaintiff is $5 a day. Plaintiffs were paid this amount until April 30, 1952, at which time the 1901st, and many other units, were advised, in part, as follows:
* * * PAYMENT OF PER DIEM ON ORGANIZATIONAL TDY PROBLEM STILL UNDER CONSIDERATION BY PER DIEM TRAVEL AND TRANSPORTATION ALLOWANCE COMMITTEE. * * * PAYMENTS SHOULD BE DEFERRED UNTIL AFFC DECISION IS OFFICIALLY RECEIVED * * *
Headquarters, Aviation Engineer Force, Wolters Air Force Base, by letter of July 1, 1952, advised all Engineer Aviation Units, in part, as follows:
*706 2. At temporary duty stations where quarters are available, no per diem is payable pending receipt of decision by Comptroller General concerning legality of such payments.
Apparently because of this message and the correspondence of Lieutenant West (Battalion Adjutant), the record is silent as to the presentation of a formal claim by the plaintiffs and a denial thereof by the Government.
Plaintiffs claim $5 a day after April 30, 1952, and the Government, by counterclaim, seeks reimbursement for excess per diem paid prior to April 30, 1952. By stipulation of the parties, approved by the trial commissioner, the trial was limited to issues of law and fact relating to the right of plaintiffs to recover, the amount of recovery or offsets, if any, to be determined later under Buie 38 (c).
8. Joint Travel Eegulations provide:
PABT D: DEFINITIONS
1150 AS USED IN TPIESE EEGULATIONS
* * * * *
4. GOVEENMENT MESS. The term “government mess” unless otherwise qualified, means any general or service organizational mess; Army and Air Force officers’ or student officers’ field mess; Navy, Marine Corps and Coast Guard officers’ closed mess; and National Guard mess. Eestaurants and cafeterias operated by armed services exchanges, officers’ clubs, and Navy officers’ open messes are not considered to be government messes.
* * * Üc *
PAET E: TEMPOEAEY DUTY ALLOWANCES IN THE UNITED STATES
$ ‡ $ ■ $ *
4201 SPECIAL CASES UNDEB WHICH TEMPO-EAEY DUTY PEE DIEM ALLOWANCES AEE NOT PAYABLE
Per diem allowances are not payable for the following periods:
*707 7. for field duty, including maneuvers, field exercises * * *
‡ 9]( ‡ ^ $
4205 AUTHORIZED PER DIEM RATES
1. GENERAL. The per diem rates authorized in these regulations are based on the status of the member, in the performance of travel and temporary duty, as directed in the orders. * * *
‡ ‡ ‡
5. RATES OF PER DIEM.
* $ $ * $
c. For * * * temporary duty at an installation
(2) Government quarters available_$5. 00
# $ ‡ ‡ *
e. For courses of instruction:
* % # if:
(2) Government quarters available — government mess not available_ 5.00
‡ ‡ ‡
(4) Government quarters and government mess available_ 1.00
Air Force Regulation No. 146-6, dated January 11, 1949, provides, in part:
9. Field ration messes for officers * * * — When desirable, officer * * * field ration messes may be organized. * * * The officer in charge of the mess will submit the daily ration request * * *
11. Meads furnished to individuáis who are required to reimburse Government therefor.— * * *
a. When it is considered essential in the performance of official duties, station or organization commanders may authorize officers * * * to be subsisted at unit or consolidated messes.
*****
12. Reimbursement for meals furnished in the field ration messes. — a. The reimbursement rates for meals furnished by messes operating under the field ration system * * * will be as follows:
* * * 35 cents per meal. * * *
Air Force Regulation No. 146-6A, dated June 17, 1949, provides, in part:
*708 11. * * * (e) * * * Civilian dependents of military personnel may be subsisted in field ration messes upon the authorization of the commanding general * * *
Air Force Regulation No. 176-11, dated August 8, 1951, entitled “NONAPPROPRIATED FUNDS,” provided, under SECTION I — GENERAD, in part, as follows:
2. General:
a. Officers’ * * * open messes, as adjuncts of the Air Force, provide services essential to the messing, billeting, morale, and welfare of the officers * * *
b. The term “open mess” as used in this Regulation will be interpreted to include messes, and associations of officers * * * organized for messing * * * but will not be confused with a field ration mess (AFR 146-6) or a Government mess as defined by paragraph 1150-4, Joint Travel Regulations. * * *
$ $ ^ sfc #
SECTION IY — OPERATION
*****
20. Activities * * * c. Field ration messes may be established and operated on the premises of sundry fund activities in accordance with AFR 146-6.
AFM 178-20, dated August 31, 1953, entitled “BASIC ALLOWANCES FOR SUBSISTENCE AND QUARTERS,” provides, in part:
20101. Statutory Provisions
# # * # %
d. Members of the Air Force who are entitled to receive a basic allowance for subsistence pursuant to this part shall be entitled to receive the following amounts: Officers: $47.88 per month.
* * * * *
20104. Entitlement
a. Officers. Commissioned or warrant officers are entitled at all times to_ receive basic allowance for subsistence * * * Commissioned or warrant officers will not be deprived of this basic allowance for subsistence because of conditions described below:
*****
(3) While messing with an organization drawing field rations. However, such officers will be required to pay for meals at the prescribed rates.
*709 Air Force Regulation No. 146-5, dated August 24, 1954, entitled “FOOD SERVICE, Reimbursement Rates for Meals,” provides, in part:
1. Purpose and Scope:
a. Purpose. This Regulation establishes the reimbursement rates for meals sold in dining halls operated with appropriated funds and prescribes the surcharge rates to be assessed officers * * *
b. Scope. The reimbursement rates prescribed herein apply to all personnel who are required to reimburse the Government for meals furnished in field ration and garrison ration dining halls. * * *
3. Reimbursement Rates. Reimbursement rates will include an amount sufficient for the reimbursement of food costs, identified as the “basic meal price” and, where applicable, an amount sufficient for the reimbursement of operating expenses, identified as the “surcharge.”
$ ‡ ‡
b. The following reimbursement rates will apply, under conditions when a surcharge is applicable, to officers and civilians not receiving a per diem allowance in lieu of subsistence.
TABLE II

c.The following reimbursement rates will apply to officers and civilians receiving a per diem allowance in lieu of subsistence. * * *
TABLE III

9. While no Army regulations relative to surcharges which were effective for the period in question were introduced *710 in evidence, witnesses referred to a surcharge as authorized by regulation, and referred to a daily charge of 80 to 90 cents, an amount in substantial agreement with the statements of plaintiffs as to the daily payments which they made for meals. Thus Air Force Regulation No. 146-5 (finding 8), although effective after the dates in issue here, may be given some weight as a guide.[1]
10. Since Government quarters were available, plaintiffs would be entitled to per diem as follows:

Plaintiffs each received a monthly subsistence of $47.88[2] (approximately $1.60 per day) in addition to any per diem allowance for temporary duty.
Charges for the daily mess were authorized under the applicable regulations as follows: Where per diem is paid, $2.25; where no per diem is paid, $1.60. In addition, each officer paid a quarters service charge of $0.50 each day. The record is not clear as to the exact expenses incurred by the plaintiffs. In the light most favorable to them, it would be $2.75 a day, which represents an “out-of-pocket” daily expense of $1.15, exclusive of any per diem.[3]
There are two basic questions of fact to be determined in this action:
*711 1. The type of duty performed (i.e., temporary duty, field duty, or a course of instruction), and
2. Whether Government messing facilities were available.
11. On February 15, 1952, the finance officer of Kelly Air Force Base sought instructions from the Finance Division under the Commanding General of the Air Materiel Command, Wright-Patterson Air Force Base, Dayton, Ohio, as to whether per diem was payable to officers of the 1901st Engineer Aviation Battalion for the period of temporary duty at Kelly Air Force Base in view of the fact that “this duty is being performed by the individuals concerned as members of a military organization.”
On May 6, 1952, the finance officer was advised that the question of payment of per diem to members of the Armed Forces on organizational temporary duty was still under consideration and that pending a decision thereon it was directed that no further travel vouchers be submitted for per diem for organizational temporary duty.
12. On July 1, 1952, a determination was made that per diem was payable to members on organizational temporary duty where quarters were not available, but the question of the allowance of per diem for organizational temporary duty where quarters were available was not decided at that time.
13. The question as to whether Government messing facilities, as contemplated by the Joint Travel Begulations of the Armed Forces, were available at Kelly Air Force Base during the period of temporary duty performed by the plaintiffs was never raised by the finance officer of Kelly Air Force Base, nor was the question raised by anyone until several months after the period of temporary duty had been concluded.
14. Having been precluded from filing vouchers for per diem for the temporary duty rendered at Kelly Air Force Base for the period subsequent to May 1, 1952, the plaintiffs filed their claims for per diem with the General Accounting Office, which claims were denied on April S, 1957, on the ground that Government messing facilities were available to the plaintiffs during their period of temporary duty.
15. Kelly Air Force Base covers a large area and is divided into North, South, East, and West Kelly. North Kelly is the *712 main Kelly Air Force Base and houses within one enclosure all permanent installations of the base. A consolidated mess in building 1650 and an officers’ club, in which there was established in the latter part of 1951 a field ration mess, were located within the North Kelly area.
16. A field ration mess is a mess financed by appropriated Government funds for the purpose of feeding military personnel, the menu being in accordance with a master menu published by the headquarters of the United States Air Force or headquarters, Air Materiel Command, in Washington, and the food for such mess is drawn from a Government commissary the same as the food is drawn for the enlisted mess halls. A field ration mess is under the administrative jurisdiction of the military food services officer, and the employees of a field ration mess are enlisted personnel or civil service employees assigned by the military food services division.
17. Outside of the main enclosure and in that section of the field known as East Kelly, the 75th Air Depot Wing, consisting of 3,000 men and 350 officers, was staging to go overseas. The 75th Air Depot Wing was a tenant organization at Kelly Air Force Base. It maintained one mess hall with ten tables for officers of its organization, serving an average of 110 officers a day.
In the Women’s Air Force (WAF) area there was a mess hall for enlisted WAF’s in which there was a table provided for officers.
The officers’ tables in the enlisted mess halls of both the 75th Air Depot Wing and the WAF area were established primarily for the officers of those organizations, and they would not have been able to accommodate the officers of any other organization without special arrangements.
18. When the plaintiffs arrived at Kelly Air Force Base, they were informed of no eating facilities except the consolidated mess in building 1650, the Post Exchange, and the mess at the officers’ club. Officers of the plaintiffs’ unit were informed by their commanding officer that they were not to eat at the consolidated mess in building 1650, and notices were placed in the daily bulletin from time to time stating that any officer eating in the consolidated mess would be reported.
*713 This directive was originated by instructions from a deputy of either the San Antonio Air Materiel Command or the Base Commander that officers of plaintiffs’ organization could eat only at the Post Exchange or officers’ club.
19. The Deputy Chief of the Base Services Division of Kelly Air Force Base, who had supervision over all military food services, including field ration messes, had no knowledge in 1952 of any messing facility that was available to officers on temporary duty other than the messing facilities located in the officers’ club.
20. The same stoves, the same pots, and the same pans were used in a single kitchen, whether for the preparation of field ration food or á la carte food. The field ration service and the a la carte service were supposed to maintain their food in separate storerooms, but the foods were often mixed, giving rise to criticisms from inspection services.
The dishes, silverware, tables, and chairs throughout the dining room were all owned by the officers’ club. The cashier receiving funds from both the field ration line and the a la carte service line was an employee of and paid by the officers’ club.
21. During the first six months of 1952, the basic charge authorized in a field ration mess was $0.30 for breakfast, $0.40 for the noon meal, and $0.40 for the evening meal, making a total authorized charge of $1.10 per day.
During this same period of time in the field ration line in the officers’ club at Kelly Air Force Base, the total charge was $1.80 per day, with perhaps an additional $0.10 being added for the noon meal and evening meal, making a total of $2 per day.
The extra charge was added onto the basic charge authorized in a field ration mess to pay for linen, silverware, extra labor, and extra food that might be needed to supplement the meal in case the menu specified for the field ration mess was not deemed to be adequate. This extra charge was put into the officers’ open mess account and accounted for under a separate account as a field ration service charge, but the money did not go to the Government.
22. During the first half of 1952, a program for feeding dependents of military personnel was in effect. In order *714 to encourage people to come to the mess and build up the field ration utilization of the evening meal, officers were encouraged to bring their families. Am officer could go through the field ration line and all of his family could eat from the field ration mess. Although the dependents were not authorized to eat under the same conditions, the officer could eat in the line accompanied by his family and the officers’ open mess (officers’ club) would procure food of a similar nature and combine it with the food in the field ration line, putting in enough to take care of the dependents who ate with the officer.
23. Civilians, including an officer’s wife and children, who ate with him in the field ration mess, obtained the same food that was served to the officer. When they reached the cash register, the officers’ food was charged against a field ration and the food of his family against the open mess. The officers’ club would then add food to the field ration mess to compensate, i.e., it added food similar to that being served in the field ration mess, in some instances implementing it with a different kind of food that was not on the menu, but at least compensating for the cost by means of adding food to the particular menu.
24. The field ration mess was initially established in the club in the latter part of 1951, after studies by and conferences between the base services division and the officers’ club officer. It was established at the club to encourage additional people to come there and participate in the activities of the club.
25. The officers’ club officer maintained supervision over the entire messing facilities at the officers’ club except that he did not have administrative control over the employees, i.e., the hiring and firing of individuals employed in the field ration mess. He did not have control over the master menu prepared for the field ration mess.
The money received in the single cash register from the field ration mess line and the a la carte line went to a civilian office manager and accountant, employed and paid by the officers’ club, who separated the funds into two accounts. The basic field ration charge, as determined by the register at the head of the field ration line, was paid to the *715 food services representative. The service charge, which was in addition to the authorized field ration charge, and funds received from the a la carte line were paid into the club funds.
26. In a conference with a representative of the Base Commander or the Commanding General of the San Antonio Air Materiel Area, members of the plaintiffs’ organization, who objected to having to pay an initiation fee to the officers’ club, were told they must join the officers’ club if they expected to eat there.
Officers eating in the field ration line were authorized to charge meals on their officers’ club bills, which were rendered to them at the end of the month.
27. Per diem is currently being paid at Kelly Air Force Base for transient officers or officers on temporary duty at that base, although a mess characterized by the defendant as a field ration mess exists on the base, the amount of the charge therein being determined by whether or not an officer is on per diem. If he is not on per diem, he pays the basic food charge plus a surcharge. If he is on a per diem, is living in Government-furnished quarters, and eats the same meal in the field ration mess, he pays an additional charge for his meals. This rule or policy was not in effect for the first six months of 1952.
28. There were three messes in operation at Kelly Air Force Base which met the requirements of a Government mess under the Joint Travel Regulations. While all of these messes were available, plaintiffs were, by appropriate order, restricted to the use of the additional mess in operation at the officers’ club. Thus the question of availability of Government mess is dependent upon whether the latter mess qualifies.[4]
29. During the period involved in this litigation, messing facilities were available at the officers’ club, at Kelly Air Force Base. A field mess was set up pursuant to appropriate regulations and under the orders of the commanding officer which were in effect before and during the temporary *716 duty of plaintiffs. In actual operation it consisted basically of two lines, one for the field mess and the other for á la carte service. The lines converged at the cash register. If á la carte service was utilized, the meal was recorded on key “A”; if field mess service was used, on key “B”. The officer would pay for the basic meal and the surcharge and would sign a register.
While the same space and equipment were used for the field mess and á la carte service at the club, careful controls were maintained to insure full compliance with the field mess regulations. A separate accounting system was maintained. Field rations were drawn from the commissary on the basis of the “head count” ascertained from the register signed by the officers.
The club turned over to the Finance Officer the field mess collections as a credit at the commissary. The other collections were deposited in the officers’ club account. The employees working on the field mess were paid from appropriated funds, while others were paid from club funds. The field mess operation was supported from appropriated funds at no expense to the club. The field mess was under the control of the Military Services Branch, and the food served was prescribed in a master menu. Where the meal was supplemented from surcharge funds, the food was selected jointly by the club officer and the food service officer. The field mess for dependents was authorized under the regulations, and many dependents took advantage of the privilege. Civilians were limited to the á la carte service. Generally the field mess was 30 percent cheaper than the á la carte service. The surcharge was used to cover the cost of silverware and linens, and, at times, to supplement the menu.
There was no regulation requiring an officer to join the club as a condition to his eating at the field mess, although officers were expected to join, and two of the officers indicated they would have joined the club whether or not they were required to do so. One instance was cited of an officer who refused to join the club, but he was still permitted to eat there.
*717 30. The field mess facility, as set forth in finding 30, was available to the plaintiffs during the entire period of their active duty. It was set up, operated, supervised, and controlled pursuant to and in compliance with regulations applicable to field messes, and thus appears to have been a Government mess within the requirements prescribed in Joint Travel Begulations, Section 1150, paragraph 4.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment, the court concludes as a matter of law that plaintiffs performing the duty discussed herein were entitled to recover $5.00 per diem allowances during the course of such duty. Judgment will be entered accordingly.
The extent of the Government’s liability to each individual plaintiff will be determined pursuant to Rule 38(c) of the rules of this court.

 Whether the current regulation authorized $0.90, as opposed to $1.15 In the cited regulation, cannot be determined. It would appear, in any event, that these authorized rates are maximum rates, and a lesser charge may be authorized. This Court’s willingness to give effect to regulations subsequently promulgated was indicated in OaUfano, Jr. v. United, States, 145 Ct. Cl. 245, 170 F. Supp. 800.

 This is the amount paid to all military personnel entitled to the standard subsistence allowance.

 The testimony of the plaintiffs reflects a daily charge for meals of $2.10 or less. Lieutenant Green stated “about 70 cents plus or minus” (per meal). The club officer indicated a charge close to the authorized $1.60 or $2.25. There appears to be no doubt as to the $0.50 quarters service charge. Apparently these charges were on the assumption that some per diem was paid plaintiffs. If the Court rules no per diem can be allowed, on final adjustment, the difference between $2.25 and $1.60 ($0.65) should be credited to plaintiffs.

 The consolidated mesa, Building 1650, 75th Air Depot Wing, and WAE East Kelly were in operation as Government messes. It would therefore appear that the order restricting plaintiffs to the officers’ club was in error. However, the evidence is clear that such restriction was imposed.